*CIT CT No.*
*26-00788*

Greetings,

I hope this letter finds you well.

With the further effort to gain the credit for the customs broker exam dated in the month of April 2018 the pro se appellant Byungmin Chae made the case from the decision of the United States Court of International Trade to the Court of Appeals for the federal circuit but this court chose not to exercise the legal authority in the appeal as this court does not consider arguments not presented to the lower court. (Please see page 6 in the court order as attached)

For this purpose the appellant Byungmin Chae would like to bring the attention to the appendix of the United States v. baxter court case 1 filed on 11/26/2018 on page 2 II. Discussion stating that the fourth amendment protects citizens from "unreasonable searches and seizures of their persons, houses, papers and effects" U.S. Const., amend IV. And the fourth amendment protects the citizens from governmental intrusions into areas in which citizens have a "reasonable expectation of privacy".

(on page 2)

**II. DISCUSSION**

The Fourth Amendment protects citizens from "unreasonable searches and seizures" of "their persons, houses, papers and effects." U.S. Const., amend. IV. The Fourth Amendment protects citizens from governmental intrusions into areas in which citizens have a "reasonable expectation of privacy." *See, e.g., Byrd v. United States,* 138 S. Ct. 1518, 1526, 200 L.Ed. 2d 805 (2018). "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen,* 466 U.S. 109, 113 (1984).

Once again, here are the key findings the court of the appeals for the federal circuit missed in the decision

1. The court should consider the case ruling of the "baxter I" and at the time of the exam it was legally effective by the constitution 4th amendment that the warrantless search of the mail packages was **"unlawful"**

2. This new fact that was not legitimately known or discoverable at the time of the first lawsuit can be the base for the new case and **prevent the application of the "res judicata"**

As the new evidence is critical and plays the essential role in the fairness of the court decision the failure to review these claims would result in the fundamental injustice. I would be looking forward to your cooperation at this time.

Sincedrely,

Byungmin Chae
Tel 646-678-0066
Email: benchaeny@gmail.com
Date: January 15 2026

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**BYUNGMIN CHAE,**
*Plaintiff-Appellant*

v.

**UNITED STATES,**
*Defendant-Appellee*

---

2025-1379

---

Appeal from the United States Court of International Trade in No. 1:24-cv-00086-TMR, Judge Timothy M. Reif.

---

Decided: November 19, 2025

---

BYUNGMIN CHAE, Elkhorn, NE, pro se.

MARCELLA POWELL, Commercial Litigation Branch, Civil Division, United States Department of Justice, New York, NY, for defendant-appellee. Also represented by PATRICIA M. MCCARTHY, JUSTIN REINHART MILLER, BRETT SHUMATE; PAULA S. SMITH, Office of the Assistant Chief Counsel, United States Customs and Border Protection, United States Department of Homeland Security, New York, NY.

---

Before DYK, REYNA, and STOLL, *Circuit Judges*.

PER CURIAM.

Pro se appellant Byungmin Chae appeals from a decision of the United States Court of International Trade dismissing his complaint for failure to state a claim. We affirm.

BACKGROUND

Customs brokers help importers and exporters navigate cross-border transactions with U.S. Customs and Border Protection (Customs). 19 U.S.C. § 1641(a). To become a licensed customs broker, an applicant must sit for the Customs Broker License Examination and score at least 75 percent on the examination. 19 C.F.R. § 111.11(a)(4). Mr. Chae took the examination in April 2018 and received a score of 65 percent. As a result, Mr. Chae did not pass the examination.

This appeal concerns Customs' denial of Mr. Chae's request to credit his response to Question 27. Question 27 reads:

> 27. Which of the following mail articles are not subject to examination or inspection by Customs?
>
> A. Bona-fide gifts with an aggregate fair retail value not exceeding $800 in the country of shipment.
>
> B. Mail packages addressed to officials of the U.S. Government containing merchandise.
>
> C. Diplomatic pouches bearing the official seal of France and certified as only containing documents.
>
> D. Personal and household effects of military and civilian personnel returning to the United

States upon the completion of extended duty abroad.

E. Plant material imported by mail for purposes of immediate exportation by mail.

Gov't Informal Response Br. 5 n.2. Mr. Chae selected choice B, but Customs designated choice C as the correct answer. *Id.*

Mr. Chae administratively appealed to Customs the April 2018 examination results, arguing he deserved credit to several questions including Question 27. Customs rejected Mr. Chae's arguments for Question 27, but it credited him for other questions and raised his score. Mr. Chae's adjusted score remained below the 75 percent pass/fail threshold.

## A. *Chae I*

In 2020, Mr. Chae filed suit at the U.S. Court of International Trade (Trade Court) challenging Customs' decision with respect to Question 27. Appx7.[1] Mr. Chae argued that Question 27 was ambiguous because it was unclear whether the "mail packages" in choice B originated from inside or outside the United States, which according to Mr. Chae, changes the answer. *Chae v. Yellen*, 579 F. Supp. 3d 1343, 1359–60 (Ct. Int'l Trade 2022) (*Chae I*). Mr. Chae asserted that choice B was the correct answer in view of 19 C.F.R. § 145.2(b)(1) and 19 C.F.R. § 145.37. *Id.* The Trade Court rejected these arguments, concluding "Customs' decision to deny plaintiff credit for Question 27 was supported by substantial evidence." *Id.* at

---

[1]    "Appx" refers to the appendix accompanying Mr. Chae's Informal Brief, which is docketed at ECF No. 13, and the cited pages correspond to the page numbering as docketed at ECF No. 13.

1360–61. Thus, the Trade Court dismissed Mr. Chae's action. *Id.* at 1372.

Mr. Chae appealed to this court. We affirmed the Trade Court's decision. *Chae v. Yellen*, No. 2022-2017, 2023 WL 3072385, at *7 (Fed. Cir. Apr. 25, 2023), *cert. denied*, 144 S. Ct. 347 (2023), *reh'g denied*, 144 S. Ct. 714 (2024). As to Question 27, we "agree[d] with the [Trade Court] that the regulations are sufficiently clear, and that choice B is not a reasonable selection in light of 19 C.F.R. §§ 145.2(b), 145.37(c), and 145.38." *Id.* at *5. As a result, we affirmed the dismissal.

## B. *Chae II*

In 2024, Mr. Chae filed a second lawsuit in the Trade Court. This time, he alleged that "I need just one more credit to pass the exam" and again asked the Trade Court to order Customs to give him credit for Question 27. SAppx15.[2] He raised two new issues with respect to Question 27, which he called "controversial issues." SAppx15–17. First, he alleged the definition of "customs territory" is inconsistent between two different regulations. *Id.* (arguing 19 C.F.R. § 145.2(b) includes U.S Virgin Islands while 19 C.F.R. § 101.1 excludes U.S. Virgin Islands). Second, he alleged "insular possessions" of the United States (such as the U.S. Virgin Islands) may be exempt from the "customs territory." *Id.* (discussing 19 C.F.R. § 7.2).

The government filed a motion to dismiss for failure to state a claim. The Trade Court granted the motion based on claim preclusion, concluding Mr. Chae "simply presents an additional reason that he should have been awarded credit for the same question [No. 27] that was the subject

---

[2]    "SAppx" refers to the supplemental appendix accompanying the government's informal response brief, which is docketed at ECF No. 18.

CHAE v. US                                                           5

of *Chae I*." *Chae v. United States*, 736 F. Supp. 3d 1364,
1370 (Ct. Int'l Trade 2024) (*Chae II*). The Trade Court
noted "the claim in *Chae I* and the present claim share the
identical objective of obtaining credit for Question No. 27
and achieving a 75 percent score on the [Customs Broker
License Examination]." *Id.* The Trade Court dismissed
Mr. Chae's complaint without leave to amend. SAppx14.

Mr. Chae appeals the Trade Court's dismissal of his
complaint. We have jurisdiction under 28 U.S.C.
§ 1295(a)(5).

### STANDARD OF REVIEW

We review de novo decisions by the Trade Court to
grant a motion to dismiss. *Target Corp. v. United States*,
134 F.4th 1307, 1312 (Fed. Cir. 2025). Similarly, we review
de novo decisions to bar a claim under claim preclusion.
*Acumed LLC v. Stryker Corp.*, 525 F.3d 1319, 1323 (Fed.
Cir. 2008).

### DISCUSSION

This appeal is Mr. Chae's second appeal to this court
concerning the same issue—whether he is entitled to credit
for Question 27 on his Customs Broker License Examina-
tion. We agree with the Trade Court's decision to dismiss
on the basis of claim preclusion.

Claim preclusion operates to bar litigation of issues
that "could have and should have reasonably been brought"
in the earlier suit. *Bowers Inv. Co. v. United States*,
695 F.3d 1380, 1384 (Fed. Cir. 2012). The doctrine applies
when: "(1) the parties are identical or in privity; (2) the first
suit proceeded to a final judgment on the merits; and (3)
the second claim is based on the same set of transactional
facts as the first." *Ammex, Inc. v. United States*, 334 F.3d
1052, 1055 (Fed. Cir. 2003) (citing *Parklane Hosiery Co. v.
Shore*, 439 U.S. 322, 326 n.5 (1979)).

Here, all three prongs are met. Mr. Chae does not dispute that the first two prongs are met. Appx49. As to the third prong, Mr. Chae's claim in the present appeal is directed to whether he should be credited as answering Question 27 correctly. This is the identical issue litigated in Mr. Chae's first appearance at the Trade Court. But Mr. Chae is entitled to "one, and only one, full and fair opportunity to litigate [his] matter." *Bowers*, 695 F.3d at 1384. Because Mr. Chae's second claim is based on the same set of transactional facts as his first, we conclude that the Trade Court was correct to dismiss on the basis of claim preclusion.

Mr. Chae argues for the first time that claim preclusion does not apply because the law relevant to Question 27 was unsettled when he took his examination in April 2018. Appellant Informal Br. 2; Appx4. Specifically, he argues that at the time of his examination he was following *United States v. Baxter*, No. 3:17-cr-24, 2018 WL 6173880 (D.V.I. Nov. 26, 2018), but after the examination "the law changed" when the Third Circuit vacated and remanded in *United States v. Baxter*, 951 F.3d 128, 136–37 (3d Cir. 2020). Appx4. And according to Mr. Chae, this change in law "was something new" that he could not have presented in *Chae I. Id.*

The problem with this argument is that it has been waived because Mr. Chae raises it for the first time in this appeal. Generally, we do not consider arguments not presented to the lower court. *Hylete LLC v. Hybrid Athletics, LLC*, 931 F.3d 1170, 1174 (Fed. Cir. 2019). Although when a party appears pro se before the lower court, as here, we may be "less stringent in requiring that the issue have been raised explicitly below." *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1323 (Fed. Cir. 2008) (quoting *Forshey v. Principi*, 284 F.3d 1335, 1357 (Fed. Cir. 2002)). We choose not to exercise such authority in this appeal and under these circumstances, we find waiver.

CONCLUSION

We have considered Mr. Chae's remaining arguments and find them unpersuasive. Accordingly, we affirm the Trade Court's final decision dismissing Mr. Chae's complaint.

**AFFIRMED**

COSTS

No costs.

Case 1:26-cv-00788-N/A    Document 1    Filed 01/21/26    Page 9 of 26

United States v. Baxter, Not Reported in Fed. Supp. (2018)

🚩 KeyCite Red Flag - Severe Negative Treatment

Vacated and Remanded by United States v. Baxter, 3rd Cir.(Virgin Islands), February 21, 2020

2018 WL 6173880

Only the Westlaw citation is currently available.

District Court of the Virgin Islands, Division of St. Thomas and St. John.

UNITED STATES of America, Plaintiff,

v.

Steven BAXTER, Shalica Baxter, Defendants.

Criminal No. 2017-24
|
Filed 11/26/2018

**Attorneys and Law Firms**

Gretchen Shappert, United States Attorney, Everard E. Potter, AUSA, United States Attorney's Office, St. Thomas, U.S.V.I., For the United States of America.

Michael L. Sheesley, St. Thomas, U.S.V.I., For Steven Baxter.

## ORDER

Curtis V. Gómez, District Judge

*1 Before the Court is the motion of Steven Baxter to suppress physical evidence.

## I. FACTUAL AND PROCEDURAL HISTORY

On March 31, 2017, Customs and Border Protection ("CBP") officers were inspecting incoming mail at the Cyril E. King Airport on St. Thomas. Bo--a K9 certified to alert to the odor of marijuana, cocaine, heroin, methamphetamine, ecstasy, and concealed humans--was smelling packages on an arriving flight at the airport. Bo's handler, Joseph Lopez ("Lopez"), was present. Bo alerted to a package sent by Priority Mail.[1] The package was sent from Jason Price in South Carolina to Mekelya Meade in St. Thomas. CBP officer Richard Kouns ("Kouns")--without consent of the sender or recipient, or the benefit of a court order--opened the package and discovered a sweater that smelled of marijuana. As Kouns was about to put the sweater back into the package, a magazine and a round of ammunition fell out of the sweater. Kouns then fully opened the sweater and discovered the parts for a weapon. *See Suppression Hr'g Tr.*, ECF No. 99 at 25 (June 4, 2018). Lopez later explained that CBP officials regularly open packages sent from the mainland United States to the United States Virgin Islands without warrants because the CBP has "border search authority" under those circumstances. *See id.* at 35:9.[2]

After hearing evidence, the Court asked the United States why no warrant was sought to search the packages:

THE COURT: ... So, why didn't the Government just get a warrant with respect to the item? It's in the Government's possession. They don't have to release it.... Why not get a warrant to just search it and avoid all of this?

MS. VLASOVA: Your Honor, as law enforcement strategy and tactic, there is no warrant requirement.

United States v. Baxter, Not Reported in Fed. Supp. (2018)

---

**\*2** *Id.* at 116:4-14.

On April 3, 2017, CBP officers discovered another package sent by Priority Mail from Jason Price in South Carolina to Mekelya Meade in St. Thomas. The April 3, 2017, package was similar in shape, size, and weight to the March 31, 2017, package. CBP officers x-rayed the package and concluded that it contained a firearm. Thereafter, the package was opened and examined. Inside the package, Kouns discovered a firearm, a magazine, and ammunition. Curiously, *after* opening the box, Kouns then had Bo sniff the package. *See id.* at 89:12-90:7.

On June 7, 2017, the Grand Jury returned an Indictment charging Steven Baxter ("Baxter") with one count of illegally transporting two firearms in violation of 18 U.S.C. §§ 922(a)(5), 924(a)(1)(D), and 924(a)(2). On March 8, 2018, the Grand Jury returned a Superseding Indictment charging Baxter with two counts of illegally transporting a firearm in violation of 18 U.S.C. §§ 922(a)(5), 924(a)(1)(D), and 924(a)(2).

On March 26, 2018, Baxter moved to suppress the evidence uncovered by the search of the packages. The Court held an evidentiary hearing on Baxter's motion to suppress on June 4, 2018.

## II. DISCUSSION

The Fourth Amendment protects citizens from "unreasonable searches and seizures" of "their persons, houses, papers and effects." U.S. Const., amend. IV. The Fourth Amendment protects citizens from governmental intrusions into areas in which citizens have a "reasonable expectation of privacy." *See, e.g., Byrd v. United States,* 138 S. Ct. 1518, 1526, 200 L.Ed. 2d 805 (2018). "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen,* 466 U.S. 109, 113 (1984).

### A. Fourth Amendment Standing

The United States asserts that the packages in this matter were "sent from a Jason Price and addressed to Mekelya Meade." *See* ECF No. 155 at 2. The United States argues that--because the packages do not "bear[ ] his name" and because, "by his not guilty plea, [Baxter] denies an ownership interest" in the packages--Baxter has no legitimate expectation of privacy in the packages. *See id.*

"Standing to challenge a search requires that the individual challenging the search have a reasonable expectation of privacy in the property searched." *Rakas v. Illinois,* 439 U.S. 128 (1978). "Fourth Amendment rights are personal rights, which, like some other constitutional rights, may not be vicariously asserted." *Id. at* 133-34 (quoting *Alderman v. United States,* 394 U.S. 165, 174 (1969) ). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Id.* at 134; *see also United States v. Davis* 393 Fed. App'x 895, 898 (3d Cir. 2010).

"Both senders and addressees of packages or other closed containers can reasonably expect that the government will not open them." *United States v. Villarreal,* 963 F.2d 770, 774 (5th Cir. 1992). The Third Circuit has recognized that "individuals may assert a reasonable expectation of privacy in packages addressed to them under fictitious names." *United States v. Pettiway,* 429 Fed. App'x 132, 136 n.5 (3d Cir. 2011) (quoting *Villarreal,* 963 F.2d at 774).

**\*3** Here, the United States acknowledges that Baxter is also known as Jason Price. *See Indictment,* ECF No. 70 at 1, 3, 5 (charging "STEVEN BAXTER a/k/a JASON PRICE" with illegally mailing firearms). The United States alleges that Baxter, using his alias Jason Price, mailed the packages at issue in this matter. Presumably, the packages are relevant because they are Baxter's. That is precisely why the United States seeks to use the packages against Baxter in the United States's case-in-chief. Under these circumstances, the Court holds that Baxter has standing to challenge the admissibility of the packages. As Baxter

United States v. Baxter, Not Reported in Fed. Supp. (2018)

has standing to challenge the warrantless searches of the packages, the Court will next address the validity of the warrantless searches that occurred here.

### B. Warrantless Searches of Mail

"Warrantless searches are presumptively unreasonable." *Horton v. California*, 496 U.S. 128, 133 (1990); *see also Katz v. United States*, 389 U.S. 347, 357 (1967) ("Searches conducted without warrants have been held unlawful 'notwithstanding facts unquestionably showing probable cause.' ") (quoting *Agnello v. United States*, 269 U.S. 20, 33 (1925) ). Moreover, it is irrelevant whether a search impermissibly conducted without a warrant ultimately uncovers evidence of a crime. *See Jacobsen*, 466 U.S. at 113 ("Such a warrantless search could not be characterized as reasonable simply because, after the official invasion of privacy occurred, contraband is discovered.").

Article I, Section 8 of the U.S. Constitution grants Congress the power "[t]o establish Post Offices and post Roads." U.S. Const., Art. I, § 8, cl. 7. This grant of power "embraces the regulation of the entire postal system of the country," which "necessarily involves the right to determine what shall be excluded" from the mails. *Ex parte Jackson*, 96 U.S. 727, 728 (1877).

Since as early as 1877, in *Ex parte Jackson*, 96 U.S. 727 (1877), the United States Supreme Court has recognized that this power does not remove mail from the protection of the Fourth Amendment. *See id.* In determining the reach of the Fourth Amendment to mailed matter,

> a distinction is to be made between different kinds of mail matter,-between what is intended to be kept free from inspection, such as letters, and sealed packages subject to letter postage; and what is open to inspection, such as newspapers, magazines, pamphlets, and other printed matter, purposely left in a condition to be examined. Letters and sealed packages of this kind in the mail are as fully guarded from examination and inspection, except as to their outward form and weight, as if they were retained by the parties forwarding them in their own domiciles. The constitutional guaranty of the right of the people to be secure in their papers against unreasonable searches and seizures extends to their papers, thus closed against inspection, wherever they may be.

*Id.* at 733.

In light of that strong protection afforded to sealed mail packages against searches, the Supreme Court made it clear that such packages were accorded the same Constitutional protection as items in a home. That is, only a warrant could justify the search of a mail package.

> *Whilst in the mail, they can only be opened and examined under like warrant*, issued upon similar oath or affirmation, particularly describing the thing to be seized, *as is required when papers are subjected to search in one's own household.*
> *Id.* (emphasis added).

Moreover, the *Jackson* Court clearly outlined the limits of any other law that might purport to subjugate the Constitutional protection afforded sealed packages against searches.

> *No law of Congress can place in the hands of officials connected with the postal service any authority to invade the secrecy of letters and such sealed packages in the mail; and all regulations adopted as to mail matter of this kind must be in subordination to the great principle embodied in the fourth amendment of the Constitution.*
> **\*4** *Id.* (emphasis added).

The Supreme Court reaffirmed these principles in *United States v. Van Leeuwen*, 397 U.S. 249 (1970) and again in *United States v. Jacobsen*, 466 U.S. 109 (1984). In *Van Leeuwen*, customs officials suspected that two packages contained gold coins that had been illegally imported from Canada. 397 U.S. at 249-50. The packages in question were mailed first-class. *Id.* at 250. Postal regulations in effect at the time "describe[d] 'first-class' mail as 'matter closed against postal inspection,' which follow[ed] the definition" in the relevant statute. *Id.* at 250 n.1. The packages were briefly detained while customs officials obtained a warrant

Case 1:26-cv-00788-N/A    Document 1    Filed 01/21/26    Page 12 of 26

United States v. Baxter, Not Reported in Fed. Supp. (2018)

to search them. *Id.* at 250, 252. Only when warrants were issued did customs officials inspect the contents of the packages. *Id.* at 250. On appeal, the Supreme Court held that the pre-search detention of the packages was permissible under the Fourth Amendment. *Id.* at 253.

The Supreme Court explained that "[i]t has long been held that first-class mail such as letters and sealed packages subject to letter postage—as distinguished from newspapers, magazines, pamphlets, and other printed matter—is free from inspection by postal authorities, except in the manner provided by the Fourth Amendment." *Id.* at 251. Analogizing the seizure of mail to a *Terry* frisk, the Supreme Court explained that "[t]he only thing done [by the customs officials] on the basis of suspicion was detention of the packages." *Id.* at 252. This did not occasion any "invasion of the right 'to be secure' in the 'persons, houses, papers, and effects' protected by the Fourth Amendment against 'unreasonable searches and seizures.' " *Id.* (quoting U.S. Const., amend. IV). While in "theory" "detention of mail could at some point become ... unreasonable," the detention in *Van Leeuwen* was reasonable under the Fourth Amendment. *Id.* Significantly, law enforcement did not search the sealed package until they obtained a search warrant.

In *Jacobsen*, a package was damaged and torn by a forklift. The package was in the care of a private freight carrier. 466 U.S. at 111. Employees of the freight carrier opened the package and discovered a white powdery substance. *Id.* The employees notified federal law enforcement officials, who tested the substance, which was revealed to be cocaine. *Id.* On appeal, the Supreme Court held that the search did not violate the Fourth Amendment. *Id.* at 126.

The Fourth Amendment protects individuals' right "to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." *See* U.S. Const., amend. IV.

> When the wrapped parcel involved in this case was delivered to the private freight carrier, it was unquestionably an "effect" within the meaning of the Fourth Amendment. Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable. Even when government agents may lawfully seize such a package to prevent loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package. Such a warrantless search could not be characterized as reasonable simply because, after the official invasion of privacy occurred, contraband is discovered.

**\*5** *Jacobsen*, 466 U.S. at 114 (footnotes omitted).

Significantly, however, the Fourth Amendment only "proscrib[es] government action; it is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.' " *Id.* at 114 (quoting *Walter v. United States*, 447 U.S. 649, 662 (1980) (Blackmun, J., dissenting) ). In *Jacobsen*, "[t]he initial invasions of respondents' package were occasioned by private action," and therefore did not violate the Fourth Amendment. *Id.* at 115. The permissibility of the government's subsequent actions "must be tested by the degree to which [those actions] exceeded the scope of the private search." *Id.* In that case, the Supreme Court held that the government's actions did not violate any expectation of privacy that had not already been frustrated by the private freight carrier, and thus did not violate the fourth amendment. *Id.* at 126.

As the cases cited above illustrate, not all packages require a warrant prior to being searched. As the Supreme Court in *Ex parte Jackson* instructed, "a distinction is to be made between different kinds of mail matter,-between what is intended to be kept free from inspection, such as ... sealed packages, ...; and what is open to inspection, such as ... printed matter, purposely left in a condition to be examined." *Ex parte Jackson*, 96 U.S. at 733.

To that end, Congress directed the Postal Service to "maintain one or more classes of mail for the transmission of letters sealed against inspection." 39 U.S.C. § 404(c) ("Section 404"). Congress has further made clear that any mail designated as "sealed against inspection" may only be opened "under authority of a search warrant authorized by law, or by an officer or employee of the Postal Service for the sole purpose of determining an address at which the letter can be delivered, or pursuant to the authorization of the addressee." *Id.*

Case 1:26-cv-00788-N/A    Document 1    Filed 01/21/26    Page 13 of 26

United States v. Baxter, Not Reported in Fed. Supp. (2018)

In accordance with Congress's mandate, the Postal Service regulations provide that "[s]ealed mail is mail that under postal laws and regulations is included within a class of mail maintained by the Postal Service for the transmission of letters sealed against inspection." 39 C.F.R. § 233.3(c)(3). "Unsealed mail is mail that under postal laws or regulations is not included within a class of mail maintained by the Postal Service for the transmission of letters sealed against inspection." 39 C.F.R. § 233.3(c)(4). "Sealed mail includes," among other classes of mail, "Priority Mail." 39 C.F.R. § 233.3(c)(3).

Similarly, through 39 C.F.R. § 111.1, the Postal Service incorporated into the regulations by reference "the Mailing Standards of the United States Postal Service, Domestic Mail Manual, a looseleaf document published and maintained by the Postal Service." 39 C.F.R. § 111.1. The Domestic Mail Manual provides that "Priority Mail matter is closed against postal inspection." Domestic Mail Manual § 113.2.2.

Here, the packages were mailed from South Carolina to the United States Virgin Islands via Priority Mail. Upon the arrival of the packages in the Virgin Islands, CBP officers searched the packages without a warrant. The government seems to have taken this course because, among other things, the packages did not bear some indication that they were first-class mail or a letter.

> **\*6** Q. ... [A]re you able to determine if this was mailed as a first class mail?
>
> A. It was mailed as a priority mail.
>
> Q. What does that mean in terms of whether or not it is a first class mail?
>
> A. First class mail must always have a stamp on it that states "first class mail" unless there is some separate identify [sic] that clearly defines it as first class.

*Suppression Hr'g Tr.*, ECF No. 99 at 43:8-17. In the absence of a stamp or some indication that the class of mail is first-class, the government, since perhaps 2012, has subjected sealed packages to warrantless searches.

> THE COURT: Officer Lopez, when you say "checking the mail," you mean having -- what do you mean by that?
>
> THE WITNESS: Checking the cargo, the boxes, the cargo, because we're not allowed to go to the letter. We cannot touch the letter mail. So we check all of the cargo coming into the Virgin Islands.
>
> Q. (By Mr. Sanchez:) Why can't you get to the letter, to the mail?
>
> A. Those are the rules that we were explained, we cannot touch the letter. Unless we get a search warrant, we can't touch that.

*Id.* at 33:13-25.

The government's position not only seems to be contrary to well-established Constitutional law, *see, e.g., Jacobsen*, 466 U.S. at 114 (recognizing "wrapped parcel" containing white powdery substance as "unquestionably an 'effect' within the meaning of the Fourth Amendment"), remarkably it is even contrary to the regulations regarding sealed mail packages. See Domestic Mail Manual § 113.2.2 (" 'Priority Mail matter is closed against postal inspection.' "). Because Priority Mail is the equivalent of a "wrapped parcel" sealed against inspection, law enforcement officers were required to obtain a warrant before opening the packages. Accordingly, their failure to obtain a warrant was unconstitutional. Indeed, such a warrantless search could only be constitutionally permissible if an exception to the warrant requirement applied to the searches undertaken here.

### C. Exception to Warrant Requirement

"Searches conducted outside the judicial process, without prior approval by a judge or magistrate, are *per se* unreasonable under the Fourth Amendment subject only to a few specifically established exceptions." *Katz*, 389 U.S. at 357. "Such exceptions are based on the Supreme Court's determination that a particular search is reasonable, that is, that the government's legitimate interests in the search outweigh the individual's legitimate expectation of privacy in the object of the search." *United States v. Salmon*, 944 F.2d 1106, 1120 (3d Cir. 1991); *see also United States v. Hyde*, 37 F.3d 116, 118 (3d Cir. 1994). Warrantless

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.                    5

border searches are one such exception. *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 63 (1974) ("[T]hose entering and leaving the country may be examined as to their belongings and effects, all without violating the Fourth Amendment."); *see also Hyde*, 37 F.3d at 118.

In *United States v. Ramsey*, 431 U.S. 606 (1977), the United States Supreme Court recognized that sealed envelopes *originating* in another country and *entering* the United States fell within the border exception. Indeed, in that case, the Supreme Court counseled that

> **\*7** customs officials could search, without probable cause and without a warrant, envelopes carried by an entering traveler, whether in his luggage or on his person.... Surely no different constitutional standard should apply simply because the envelopes were mailed, not carried. The critical fact is that the envelopes cross the border and enter this country, not that they are brought in by one mode of transportation rather than another. It is their entry into this country from without it that makes a resulting search "reasonable."

*Id.* at 620; *cf. United States v. Hyde*, 37 F.3d 116 (3d Cir. 1994).[3]

To the extent the sealed packages crossed an international border; that is, in either direction between non-United States territory and United States territory, arguably the packages may not be an "effect" protected by the Fourth Amendment. The Court will next address border issues implicated by the searches here, as well as other circumstances that may allow for warrantless searches.

### D. Presence of Circumstances That May Permit Warrantless Searches

Here, CBP officers subjected packages mailed from South Carolina to the Virgin Islands to warrantless searches. South Carolina assuredly is not a foreign country, such that sealed mail from that state would ordinarily be subject to warrantless search. Thus, the Priority Mail packages in this case that originated in South Carolina are sealed domestic mail. *See* Domestic Mail Manual § 113.2.2. Second, they remain protected from a warrantless search unless their native inviolate character is transformed by some intrusive search by a non-government agent, *e.g., Jacobsen* 466 U.S. at 115, or they are transferred to a foreign territory, *see Ramsey*, 431 U.S. at 620. If neither of these circumstances occurred, the Priority Mail packages here should be free from warrantless searches. If neither circumstance occurred and a search is permissible, arguably the Fourth Amendment does not apply in the United States Virgin Islands. Alternatively, it is arguable that some hybrid form of the Fourth Amendment exists in the Virgin Islands, the legal vestiges of which are a version that (1) is devoid of the normal Fourth Amendment Constitutional protections highlighted by the Supreme Court in *Ex parte Jackson*; and (2) lacks any reliable and predictable vigor. The Court addresses each potential transformative circumstance in turn.

### 1. Warrantless Searches by a Private Actor

**\*8** The record indicates that the searches here were undertaken solely by government officials. Thus, the searches do not fall into the category of searches conducted by private actors (independent of government direction), like that in *Jacobsen*, that escape Fourth Amendment scrutiny.

### 2. Transfer of Package To or From a Non-United States Territory

The packages at issue here were mailed from the mainland to the Virgin Islands. They never left United States territory. Unless some other legally transformative event occurred, a warrantless search of the Priority Mail packages here would be unconstitutional. Indeed, if the sealed packages here were destined for Puerto Rico, there is little dispute that the packages would be protected from warrantless searches. *United States v. Colon-Solis*, 508 F. Supp. 2d 186, 191 n.2 (D.P.R. 2007) (discussing "well-established principle that shipments to and from Puerto Rico are not subject to inspection under the border exception to the

Case 1:26-cv-00788-N/A    Document 1    Filed 01/21/26    Page 15 of 26

United States v. Baxter, Not Reported in Fed. Supp. (2018)

Fourth Amendment"). The United States has indicated as much in its supplemental briefing on Baxter's motion to suppress. *See* ECF No. 155 at 1 ("The Court's initial inquiry posed two questions. The first question is whether Customs and Border protection can search mail arriving in Puerto Rico from the mainland United States without first obtaining a warrant. The government's answer is no."); *see also Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 319 (3d Cir. 2003) ("[A] plaintiff, who has obtained relief from an adversary by asserting and offering proof to support one position, may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention." (internal quotation marks omitted) ). That position is not surprising, as Puerto Rico is a territory of the United States. A person or thing traveling from the mainland United States to Puerto Rico leaves United States territory and arrives in United States territory. Given that circumstance, it would seem that, constitutionally, a warrantless search of the packages here may be permissible if, unlike a package arriving in Puerto Rico, arrival in the Virgin Islands was the legal equivalent of arrival in a non-United States territory.

This Court recently addressed the domestic nature of the United States Virgin Islands in the context of a tariff law. In *United States v. Ten Thousand Six Hundred & Seventy-Seven Dollars ($10,677.00) in U.S. Currency, Representing 5,419 Puerto Rican Lottery Tickets*, No. CV 2016-12, 2018 WL 2745903, at *4 (D.V.I. June 7, 2018) (the "Puerto Rican Lottery Case"), this Court was confronted with the question of whether the United States Virgin Islands was a "foreign country" under 19 U.S.C. § 1305(a) ("Section 1305"), which provides that "[a]ll persons are prohibited from importing into the United States from any foreign country ... any lottery ticket." *See* 19 U.S.C. § 1305(a).

In the Puerto Rican Lottery case, the Court reasoned:

Section 1305(a) forbids an individual from "importing [certain goods] into the United States *from any foreign country*." 19 U.S.C. § 1305(a) (emphasis added). The text references two geographic categories: the United States and foreign countries. It does not necessarily follow that there are *only* two dichotomous geographic categories for customs purposes: the United States customs territory (which excludes the Virgin Islands) and foreign countries (of which the Virgin Islands would be regarded as part). If that were the case, then the phrase "from any foreign country," would be entirely superfluous as any good "import[ed] ... *into* the United States" would necessarily be imported from a foreign country. *See id.* (emphasis added). **\*9** *Id.* at *4. In addition to the plain language of the statute, the Court also found that "[r]elevant caselaw pre-dating the passage of 19 U.S.C. § 1305(a) also supports the conclusion that the Virgin Islands is not a foreign country." *Id.* at *6. The Court explained:

The Supreme Court first addressed whether a United States territory constituted a foreign country under the tariff laws in *De Lima v. Bidwell*. 182 U.S. 1, 21 S. Ct. 743, 45 L.Ed. 1041 (1901). In that case, the Supreme Court considered whether a tariff statute that provided that certain duties "shall be levied, collected, and paid upon all articles imported from foreign countries" applied to articles imported from Puerto Rico. *Id.* at 180-181. The Supreme Court held that the statute did not apply. It reasoned, in pertinent part, that:

Territory thus acquired can remain a foreign country under the tariff laws only upon one or two theories: Either that the word 'foreign' applies to such countries as were foreign at the time the statute was enacted, notwithstanding any subsequent change in their condition, or that they remain foreign under the tariff laws until Congress has formally embraced them within the customs union of the states. The first theory is obviously untenable ... *[A] country ceases to be foreign the instant it becomes domestic*. So, too, if Congress saw fit to cede one of its newly acquired territories (even assuming that it had the right to do so) to a foreign power, there could be no doubt that from the day of such cession and the delivery of possession such territory would become a foreign country, and be reinstated as such under the tariff law. Certainly no act of Congress would be necessary in such case to declare that the laws of the United States had ceased to apply to it.

*The theory that a country remains foreign with respect to the tariff laws until Congress has acted by embracing it within the customs union presupposes that a country may be domestic for one purpose and foreign for another.* It may undoubtedly become necessary, for the adequate administration of a domestic territory, to pass a special act providing the proper machinery and officers, as the President would have no authority, except under the war power, to administer it himself;

United States v. Baxter, Not Reported in Fed. Supp. (2018)

but no act is necessary to make it domestic territory if once it has been ceded to the United States. We express no opinion as to whether Congress is bound to appropriate the money to pay for it. This has been much discussed by writers upon constitutional law, but it is not necessary to consider it in this case, as Congress made prompt appropriation of the money stipulated in the treaty. *This theory also presupposes that territory may be held indefinitely by the United States;* that it may be treated in every particular, except for tariff purposes, as domestic territory; that laws may be enacted and enforced by officers of the United States sent there for that purpose; that insurrections may be suppressed, wars carried on, revenues collected, taxes imposed; in short, that everything may be done which a government can do within its own boundaries, and yet that the territory may still remain a foreign country. That this state of things may continue for years, for a century even, but that until Congress enacts otherwise, it still remains a foreign country. To hold that this can be done as matter of law we deem to be pure judicial legislation. *We find no warrant for it in the Constitution or in the powers conferred upon this court.* It is true the nonaction of Congress may occasion a temporary inconvenience; but it does not follow that courts of justice are authorized to remedy it by inverting the ordinary meaning of words.

**\*10** *Id.* at 197–98 (emphasis added). The Supreme Court subsequently reaffirmed, several times, that a United States territory is not a foreign country. *See, e.g., The Diamond Rings,* 183 U.S. 176, 22 S. Ct. 59, 46 L.Ed. 138 (1901) (reaching the same conclusion with respect to the Philippine Islands); *Faber v. United States,* 221 U.S. 649, 658, 31 S. Ct. 659, 659, 55 L.Ed. 897 (1911)(holding that a most favored nation clause in a treaty with Cuba did not require the United States to extend to Cuba a preferential duty rate that had been granted to the Philippine Islands).
*Id.*

While not directly on point, the reasoning in the Puerto Rican Lottery Case provides some guidance here on the question of whether the United States Virgin Islands is non-United States territory for Fourth Amendment purposes, such that it should be treated differently than Puerto Rico with respect to warrantless searches of sealed packages travelling from the United States mainland to a well-established United States territory.[4] The Court is aware of no precedent that would require treating the United States Virgin Islands as a foreign country or non-United States territory for the purposes of the Fourth Amendment.

### 3. Application of the Fourth Amendment in the Virgin Islands

While the Virgin Islands is "[o]bviously ... not a 'foreign country,' " it is not a state. *Vento v. Dir. of Virgin Islands Bureau of Internal Revenue,* 715 F.3d 455, 466 (3d Cir. 2013). Rather, the Virgin Islands is "an unincorporated territory of the United States." *Ballentine v. United States,* 486 F.3d 806, 811 (3d Cir. 2007). The Third Circuit has opined that "[a]n unincorporated territory is one that is not nearing statehood and whose subjects do not enjoy full constitutional guarantees. For example, Virgin Islands residents are not permitted to vote in presidential elections, although they are U.S. citizens. They are represented in Congress by a single non-voting delegate." *Vooys,* 901 F.3d at 177 n.10 (citations omitted). The Fourth Amendment, however, is not among the constitutional guarantees denied to Virgin Islanders. *See* 48 U.S.C. § 1561 (providing that "the first to ninth amendments inclusive" "shall have the same force and effect there as in the United States or in any State of the United States").

Indeed, it is well-settled that "[t]he Fourth Amendment applies in the United States Virgin Islands." *United States v. Mathurin,* 561 F.3d 170, 174 n.3 (3d Cir. 2009); *see also Boumediene v. Bush,* 553 U.S. 723, 758 (2008) (explaining that, "as early as ... 1922, the [U.S. Supreme] Court took for granted that even in unincorporated Territories the Government of the United States was bound to provide to noncitizen inhabitants 'guaranties of certain fundamental personal rights declared in the Constitution.' ") (quoting *Balzac v. Porto Rico,* 258 U.S. 298, 312 (1922) ); *Soto v. United States,* 273 F. 628, 633 (3d Cir. 1921) (explaining that after the United States acquired the United States Virgin Islands, "the fundamental law of the Constitution guaranteeing certain rights to all within its protection," namely the law securing "natural or personal rights" that are "enforced ... by prohibition against interference," applied of its own force).

Case 1:26-cv-00788-N/A    Document 1    Filed 01/21/26    Page 17 of 26

United States v. Baxter, Not Reported in Fed. Supp. (2018)

#### 4. Customs Zone Exclusion as a Basis for Hybrid Application of Fourth Amendment to United States Territory

*11   The Court will next consider whether, in spite of the United States Virgin Islands's status as a United States Territory, there is nevertheless some type of border that would justify warrantless searches on persons and things traveling from the mainland United States to the United States Virgin Islands.

To appreciate the underpinnings that should inform any border or customs zone discussion involving the Virgin Islands, a brief review of some Virgin Islands history is warranted.

On April 1, 1914, Christian the Tenth, King of Denmark, the Vandals and the Goths, Duke of Slesvig, Holstein, Stormarn, Ditmarsh, Lauenborg, and Oldenborg, sanctioned Danish Law No. 64-1914. Section 1 of that law, in pertinent part, provides:

> On all goods which are imported in St. Thomas and St. Jan, and which do not, according to § 2 below, enter duty free, an import duty of 6% of the value shall be imposed ....

Act No. 64-1914, concerning Custom House and Ships Dues in St. Thomas and St. Jan, § 1 (Apr. 1, 1914), *reprinted in* 1 V.I.C., Historical Documents, Organic Act of 1936. In accord with Danish Law No. 64-1914, an ordinance of the Colonial Council of St. Thomas and St. Jan, approved on August 6, 1914, provided guidance for the imposition and collection of import duties. Colonial Council of St. Thomas and St. Jan Ordinance of August 6, 1914 (Aug. 6, 1914), *reprinted in* 1 V.I.C., Historical Documents, Organic Act of 1936. Section 29 of the Ordinance provided, in pertinent part, that

> [a]ll amounts derived from confiscations and fines, arising from this Ordinance, shall accrue to the Colonial Treasury ....
> *Id.* at § 29.

"When the United States purchased the Virgin Islands from Denmark in 1917, laws were already in place which provided for Customs duties to be levied upon goods coming into the Virgin Islands, with the revenue going to the colonial treasury." *Paradise Motors, Inc. v. Murphy*, 892 F. Supp. 703, 704 (D.V.I. 1994) (quoting *United States v. Chabot*, 19 V.I. 28, 37, 531 F. Supp. 1063, 1069 (D.V.I. 1982) ). After purchasing the Virgin Islands, Congress passed the Organic Act of 1917 (the "1917 Organic Act"). Section 4 of that act, codified at 48 U.S.C. § 1395, provides in relevant part that "the customs laws and regulations" in the Virgin Islands in effect before the purchase would "continue in force and effect."[5] Pub. L. No. 64-389, § 4, 39 Stat. 1132 (1917). In 1932, Congress amended the 1917 Organic Act to provide: "The officials of the Customs and Postal Services of the United Sates are hereby directed to assist the appropriate officials of the municipality of Saint Croix, or of the municipality of Saint Thomas and Saint John, in the collection of these taxes." Pub. L. No. 72-193, § 4, 47 Stat. 333 (1932).

*12   In 1936, Congress passed the Organic Act of 1936 (the "1936 Organic Act"). Section 36 of that act, codified at 48 U.S.C. § 1406i, provides in relevant part that, "[u]ntil Congress shall otherwise provide, all laws concerning import duties and customs in the municipality of Saint Thomas and Saint John now in effect shall be in force and effect in and for the Virgin Islands." Pub. L. No. 74-749, § 36, 49 Stat. 1816 (1936). Section 36 also directed the Secretary of the Treasury to "designate the several ports and sub-ports of entry in the Virgin Islands of the United States and shall make such rules and regulations and appoint such officers and employees as he may deem necessary for the administration of the [local] customs laws in the Virgin Islands of the United States." *Id.*

In 1954, Congress passed the Revised Organic Act. The Revised Organic Act did not speak to the Danish custom laws addressed in Section 36 of the 1936 Organic Act and Section 4 of the 1917 Organic Act. Section 8 of the Revised Organic Act, codified at 48 U.S.C. 1574, provided, however, that the "laws made applicable to the Virgin Islands by or pursuant to the [1936 Revised Organic] Act ... and all local laws and ordinances in force in the Virgin Islands ... on the date of approval of this Act shall, to the extent they are not inconsistent with this Act, continue in force and effect." Pub. L. No. 83-517, § 7(c), 68 Stat 501 (1954). As such, Section 36 of the 1936 Organic Act remains in effect. *See, e.g., Polychrome Int'l Corp. v. Krigger*, 5 F.3d 1522, 1534 n.

United States v. Baxter, Not Reported in Fed. Supp. (2018)

29 (3d Cir. 1993). Under Section 28 of the Revised Organic Act, the "proceeds of customs duties, ... less the cost of collecting such duties," were to "be covered into the treasury of the Virgin Islands."[6] Pub. L. No. 83-517, § 28(a), 68 Stat 501 (1954).

In 1977, Congress amended Section 8 of the Revised Organic Act and added a subsection (f). *See* Pub. L. No. 95–134 (HR 6550), § 301(c), 91 Stat 1159 (1977). Subsection (f) provides:

(f) Customs duty; duty-free importation; effect on other customs laws

(1) The Legislature of the Virgin Islands may impose on the importation of any article into the Virgin Islands for consumption therein a customs duty. The rate of any customs duty imposed on any article under this subsection may not exceed--

(A) if an ad valorem rate, 6 per centum ad valorem; or

(B) if a specific rate or a combination ad valorem and specific rate, the equivalent or 6 per centum ad valorem.

(2) Nothing in this subsection shall prohibit the Legislature of the Virgin Islands from permitting the duty-free importation of any article.

(3) Nothing in this subsection shall be construed as empowering the Legislature of the Virgin Islands to repeal or amend any provision in law in effect on the day before October 15, 1977, which pertains to the customs valuation or customs classification of articles imported into the Virgin Islands.

*Id.; see also* 48 U.S.C. § 1574(f).

Under this authority, the Government of the Virgin Islands enacted 33 V.I.C. § 525 ("Section 525"). Section 525 provides:

The amount of customs duty to be paid on any article of foreign origin imported into the Virgin Islands which article has been shipped from within the United States Customs Zone shall be that amount which when added to the duty paid to the United States on said article equals six percent of the value of the article when imported into the Virgin Islands. For the purpose of the preceding sentence, the amount of the duty paid in the United States shall be construed to be the greater of the following:

*13 (1) The amount of duty actually paid on said articles to the United States as shown on a receipt from the U.S. Customs Service or by other documentation acceptable to the U.S. Customs Service officials in the Virgin Islands.

(2) The amount of duty that would be payable on said article to the United States based on the rates of duty on such articles shown in the tariff schedules of the United States, as amended (12 U.S.C. § 1202), and the value of such article when imported into the United States.

In the case of (2) above, documentation acceptable to the U.S. Customs Service officials in the Virgin Islands showing that the item has been shipped from within the United States Customs Zone shall be required of the importer. Should the amount of duty paid to the United States on an article as computed under (1) or (2) above be six percent or greater of the value of the article when imported into the Virgin Islands, then such article shall enter the Virgin Islands free of duty.

For the purposes of this section, an article is not shipped from within the United States Customs Zone if it is shipped from a duty-free warehouse located in the United States, if it is transshipped through the United States without incurring a customs duty in the United States, or if it is shipped in any other manner which avoids the payment of a customs duty in the United States.

33 V.I.C. § 525. In addition, while the Virgin Islands repealed all Danish laws when it adopted the Virgin Islands Code, it exempted "the 'Law concerning Custom House and Ship Dues in St. Thomas and St. Jan' " from that repeal. *See* 1 V.I.C. § 6.

As discussed above, Section 36 of the 1936 Organic Act directed the Secretary of the Treasury to "make such rules and regulations and appoint such officers and employees as he may deem necessary for the administration of the customs laws in the

Case 1:26-cv-00788-N/A     Document 1     Filed 01/21/26     Page 19 of 26

United States v. Baxter, Not Reported in Fed. Supp. (2018)

Virgin Islands of the United States." 48 U.S.C. § 1406i. Pursuant to that direction, the Secretary of the Treasury promulgated 19 C.F.R. § 7.2. That regulation, in relevant part, provides:

> The Secretary of the Treasury administers the customs laws of the U.S. Virgin Islands through the U.S. Customs and Border Protection. The importation of goods into the U.S. Virgin Islands is governed by Virgin Islands law; however, in situations where there is no applicable Virgin Islands law or no U.S. law specifically made applicable to the Virgin Islands, U.S. laws and regulations shall be used as a guide and be complied with as nearly as possible. Tariff classification of, and rates of duty applicable to, goods imported into the U.S. Virgin Islands are established by the Virgin Islands legislature.

19 C.F.R. § 7.2(c); *see also Virgin Islands Port Auth. v. United States*, 136 Fed. Cl. 7, 8–9 (2018) ("As a part of the Treasury Department, CBP's authority to administer customs law in the Virgin Islands derives from the 1936 Revised Organic Act which designated the Secretary of Treasury as administrator of Virgin Islands customs law."); *United States v. Wray*, No. CR. 2002-53, 2002 WL 31628435, at *3 (D.V.I. June 17, 2002) ("[T]he executive branch maintains jurisdiction over the administration of customs laws within the Virgin Islands by virtue of the language of section 36 of the 1936 Organic Act.").

*\*14* As authorized by Congress, the Government of the Virgin Islands imposes duties on many items of foreign origin that may be imported into the United States Virgin Islands. *See* 33 V.I.C. § 525 (authorizing collection of customs duty on "any article of foreign origin imported into the Virgin Islands[,] which ... has been shipped from within the United States Customs Zone," in addition to duties collected in the United States). An obligation to pay customs duties arises when certain items cross from the mainland United States into the United States Virgin Islands. Arguably then, some type of border--or an approximation of one--exists between the United States Virgin Islands and the rest of the United States with respect to items of foreign--that is, non-United States--origin leaving the mainland and entering the Virgin Islands. Significantly, however, while the enforcement of Virgin Islands customs laws is assisted by federal officials, the customs laws with respect to imported goods are not federal but territorial laws. See *Pollard*, 326 F.3d at 401; *Hyde*, 37 F.3d at 121. While routine warrantless border searches would aid in enforcing the custom laws of the Virgin Islands, the interest of the United States in the enforcement of territorial law is certainly no greater than the interest of the United States in enforcing its own Constitution.[7] Further, in *Hyde*, the Third Circuit found significant that Congress, through 19 U.S.C. § 1467, had "specifically authorized customs inspections when travelers enter the United States from the Virgin Islands and other United States possessions in the same manner as if the traveler had come from a foreign country." *See Hyde*, 37 F.3d at 121. The Court is aware of no statutory authority authorizing similar inspections of persons or items entering the United States Virgin Islands from the United States mainland.

Moreover, there is no Supreme Court authority that supports the proposition that recognition, or imposition, of a tax, impost, or duty on sealed items traveling from a State into a United States territory creates a border between the United States territory and the State, at which border there is no Fourth Amendment protection that attaches to the individual whose sealed package travels from the State to the United States Territory.

To be sure, there is appellate authority recognizing the exclusion of the Virgin Islands from the United States customs zone. *See Hyde*, 37 F.3d at 122. The Third Circuit has not extended this recognition to items traveling from the mainland to the United States Virgin Islands. Indeed, the government has directed the Court to no such authority; and the Court is aware of none.

*\*15* Further, no authority has acknowledged that the primary purpose of the customs zone exclusion was to create a vehicle for revenue enhancement in the then newly acquired Virgin Islands and its developing economy. Yet, that is precisely what the relevant legislative history indicates. *See Anti-Smuggling Act: Hearings on H.R. 5496 Before the Comm. on Ways and Means*, 74th Cong. 61 (1935) ("MR. HILL. Why are the Virgin Islands excepted [from the tariff act's definition of the 'United States']? MR. MURPHY. The duties in the Virgin Islands are collected under the old Danish law. At the time the Virgin Islands came over to us that law was in effect. The collection of duties, of course, comes under this Government, but the old law remained in effect, and the duties go to the islands themselves."); H. Rep. No. 1505, at 6 (1917) (explaining that provision in 1917 Organic Act leaving Danish customs laws in effect was intended to raise "import duties to support the government of the islands"). Indeed, in 1914, the import duty was conceived as a tool to augment and support the then-Danish "Colonial Treasury." Thereafter, when Congress continued collection of the import duty, through the mechanism of a customs zone exclusion, it was a device to support

United States v. Baxter, Not Reported in Fed. Supp. (2018)

the local Virgin Islands economy. It is beyond peradventure that Congress did not conceive of the customs zone exclusion as a device to weaken "fundamental personal rights guaranteed in the Constitution," *Boumediene*, 553 U.S. at 758 (internal quotation marks omitted), such as those enshrined in the Fourth Amendment. The Court is aware of no organic Congressional decision or enactment about the Virgin Islands suggesting that the customs zone exclusion was to be a vehicle for a diminished view of Constitutional protections afforded sealed items sent from the mainland to the Virgin Islands, and the government has cited none.[8]

Finally, the rationale for a border, and the border search exception, is to keep out of the United States, or protect against, those things which are outside of its border. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985) ("Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country."). Recognizing that purpose, the Supreme Court has counseled:

> The border-search exception is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country.... The critical fact is that the envelopes cross the border and enter this country *from without it* that makes a resulting search "reasonable." *Ramsey*, 431 U.S. at 620 (emphasis added).

It is axiomatic that those things that originate in, and stay within, the territory of the United States remain free from border searches.[9] A central point highlighted by the Supreme Court in its border search jurisprudence is that items subject to a border search enter the country "*from without it.*" *See id.* (emphasis added); *see also Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973) (" 'Travellers may be so stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in.' ") (quoting *Carroll v. United States*, 267 U.S. 132, 154 (1925) ). The sealed packages that arrived in the United States Virgin Islands did not come from "without" the country.

**\*16**  Accordingly, the Court will grant Baxter's motion to suppress.


## III. CONCLUSION

The Fourth Amendment of the United States Constitution has protected individuals from unreasonable warrantless searches since its existence. That protection has been recognized by the United States Supreme Court as extending to sealed mail among and between United States residents within United States territory. The circumstances giving rise to this case--warrantless searches of sealed mail packages sent from the United States mainland to the United States Virgin Islands--raise several questions.

First, does the Fourth Amendment apply in the United States Virgin Islands? For almost a century, this Court has addressed challenges to alleged violations of the Fourth Amendment by law enforcement.[10] Significantly, the recognition of the Fourth Amendment's protection in the United States Virgin Islands has been unchallenged.

Second, to the extent that the Fourth Amendment applies in the United States Virgin Islands, does it exist in some hybrid form such that its protections fade, to some degree, merely because a sealed package originating in the United States mainland arrives in the United States Virgin Islands? The position taken by law enforcement here suggests that a Congressional act or administrative procedure that excludes the United States Virgin Islands from the United States Customs Zone does so in a way that denatures the Fourth Amendment such that its full protection, which exists for citizens that send sealed packages from the mainland to Puerto Rico,[11] fails to protect those citizens who send sealed packages from the mainland to the United States Virgin Islands.

United States v. Baxter, Not Reported in Fed. Supp. (2018)

**\*17** The Court is not persuaded that the Constitution supports such a position. *See, e.g., Marbury v. Madison*, 5 U.S. 137, 180 (1803) ("[A] law repugnant to the constitution is void; ... courts, as well as other departments, are bound by that instrument." (emphasis omitted) ). Indeed, the Fourth Amendment is pregnant with protection against warrantless searches of citizens and their effects, including sealed packages, houses, papers and effects.[12] Neither the existence nor vigor of those protections is compromised because the destination of a sealed package from the United States mainland happens to be the United States Virgin Islands.

To the extent that the government engages in warrantless searches because it is tactical to do so, as it has indicated in this case and a related case, *see Suppression Hr'g Tr.*, ECF No. 99 at 116:4-14 ("THE COURT: ... Why not get a warrant to just search [packages] and avoid all of this? MS. VLASOVA: Your Honor, as law enforcement strategy and tactic....."); *Suppression Hr'g Tr.*, Crim. No. 1:17-11, ECF No. 85 at 4:23-5:1 ("Q: Was there a specific target that was causing you to perform this search? A: No, ma'am. Just doing everything at random."), it elevates expediency over the Constitution in a way it admittedly would never do in a state or Puerto Rico, and it does so unlawfully. Where that happens it is worth recalling the Supreme Court's admonition:

> The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards.

*Almeida-Sanchez*, 413 U.S. at 273. Finally, the *sine qua non* for a border search is that the item enter the country from without. That threshold condition never occurred. In sum, where, as here, law enforcement conducts warrantless searches of sealed packages sent from the United States mainland to the United States Virgin Islands, law enforcement runs afoul of the Constitution.[13]

The premises considered, it is hereby

**ORDERED** that the Court's order at the June 4, 2018, suppression hearing denying in part the motion to suppress docketed at ECF Number 79 is **VACATED**; it is further

**ORDERED** that the motion to suppress docketed at ECF Number 79 is **GRANTED**; and it is further

**ORDERED** that the physical evidence recovered from the warrantless searches conducted on March 31, 2017, and April 3, 2017, is **SUPPRESSED**.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6173880

Footnotes

1    Priority mail is one of several "classes of mail" that is maintained by the postal service "for the transmission of letters sealed against inspection." 39 U.S.C. § 404(c); *see also* Domestic Mail Manual § 113.2.2 ("Priority Mail matter is closed against postal inspection.").

2    Lopez also shared his view that Bo is never wrong. Rather, human interpretation of what Bo indicates has been wrong.

> Q. Has Bo ever been wrong in the alert that he had provided?

> A. I don't think Bo is wrong. I think I may do a wrong interpretation.

> Q. What does that mean?

A. With the alert that means that I can see that he changed his behavior, like something calls his attention that I can believe is an alert, and I do a wrong call, maybe, but I don't see that Bo has been wrong. He has been really reliable for the agency finding narcotics.

*Suppression Hr'g Tr.*, ECF No. 99 at 21:2-12. Alternatively, it seems that whenever Bo incorrectly alerts, Lopez is willing to take the blame by attributing the error to human interpretation.

Q. And you've said before that Bo has not been wrong but you have been wrong before.

A. Yes, Sir.

Q. Okay. And so some alerts that Bo has given has led to nothing.

A. Some alerts that I believe that Bo given [sic] alert to went to nothing.

*Id.* at 31:5-11. In either case, false positives which could trigger warrantless searches could result.

3     In *United States v. Hyde*, 37 F.3d 116 (3d Cir. 1994), the defendants were subjected to warrantless searches in the St. Thomas airport as they were leaving the Virgin Islands for Florida. *Id.* at 117. The Third Circuit held "that routine customs search of persons and their belongings without probable cause as they leave the Virgin Islands for the continental United States are not unreasonable under the Fourth Amendment." *Id.* at 117.

As for the individual's interest in privacy, the Third Circuit found this was limited in the same manner as with the international border. *Id.* "[B]order searches have been consistently conducted at the border between the Virgin Islands and the mainland since the United States acquired the Virgin Islands." *Id.* While there might not be universal knowledge of this fact, the Third Circuit "believe[d] that there [wa]s sufficient public knowledge of the distinctive status of the Virgin Islands to alert such travelers to the possibility of border inquiries not experienced at state lines." *Id.*

"Balancing the intrusion on the individual's Fourth Amendment interests against the degree to which routine customs searches promote legitimate governmental interests," the Third Circuit held that the searches in that case were not unreasonable under the Fourth Amendment. *Id.*

4     The Virgin Islands, like Puerto Rico, has been part of the United States for more than a century. They each have local government, with local courts, legislatures, and executives. See, e.g., *Rodriquez v. 32nd Legislature of Virgin Islands*, 859 F.3d 199, 206 (3d Cir. 2017) (explaining that "the [Revised Organic Act of 1954] divides the Virgin Islands government into legislative, executive, and judicial branches and thereby 'implicitly incorporate[s] the principle of separation of powers into the law of the territory' ") (quoting *Kendall v. Russell*, 572 F.3d 126, 135 (3d Cir. 2009) ); *Buscaglia v. Dist. Court of San Juan*, 145 F.2d 274, 283 (1st Cir. 1944) ("We concede that the doctrine of separation of powers is implicit in the Organic Act of Puerto Rico[, which divides the government of Puerto Rico into legislative, executive, and judicial branches].").

5     The Danish customs laws extended by the Act of 1917 referred primarily to the import duty established and enforced pursuant to two Danish laws, both enacted in 1914. The first law imposed a 6% "import duty" on all goods imported into St. Thomas and St. John. Danish Law No. 64 of April 1, 1914, concerning Custom House and Ships Dues in St. Thomas and St. Jan ("Danish Law No. 64"), *reprinted in* V.I. Code Ann., Historical Documents, 69–74 (1967). The second law, Ordinance of August 6, 1914, promulgated rules for the collection of the import duty established by Danish Law No. 64. Ordinance of August 6, 1914, *reprinted in* V.I. Code Ann., Historical Documents, 74–81 (1967) ("Ordinance of 1914").

As originally enacted, these laws did not apply to the island of St. Croix; however in 1936 Congress made these Danish customs laws applicable throughout the Virgin Islands. 48 U.S.C. § 1406i (1976).

*Paradise Motors, Inc.*, 892 F. Supp. at 705.

6     In 1980, Congress passed 48 U.S.C. § 1642a, which similarly provides that "the proceeds of customs duties collected in the Virgin Islands less the cost of collecting all said duties shall ... be covered into the Treasury of the Virgin Islands." 48 U.S.C. § 1642a; see also Pub. L. No. 96-304, Title I, § 100, 94 Stat. 907 (1980).

Case 1:26-cv-00788-N/A     Document 1     Filed 01/21/26     Page 23 of 26

United States v. Baxter, Not Reported in Fed. Supp. (2018)

7     With respect to the individual's interest, it is unclear how long the United States has been conducting routine warrantless searches of incoming mail. U.S. customs regulations provide that "all mail arriving from outside the U.S. Virgin Islands which is to be delivered within the U.S. Virgin Islands, is subject to Customs examination." 19 C.F.R. § 145.2. This broad asserted authority seems at odds with another regulation, which clarifies that "[f]irst class mail originating in the Customs territory of the United States and arriving in the U.S. Virgin Islands, which is to be delivered within the U.S. Virgin Islands, shall not be opened unless: (1) A search warrant authorizing that action has been obtained from an appropriate judge or United States magistrate, or (2) The sender or the addressee has been given written authorization for the opening." 19 C.F.R. § 145.3; *see also* 19 C.F.R. § Pt. 145, Policy ("Customs officers and employees shall not open first class mail arriving in the U.S. Virgin Islands for delivery there, if it originated in the Customs territory of the United States, unless a search warrant or written authorization of the sender or addressee is obtained.").

Further, to the extent these searches have been consistently conducted, there is less cause to find "sufficient public knowledge of the distinctive status of the Virgin Islands to alert" those sending mail to the Virgin Islands that their packages may be searched without a warrant. *See id.* Individuals departing the Virgin Islands for the United States pass through a customs checkpoint. This is an obvious signal to travelers that leaving the Virgin Islands and entering a state is somewhat different than traveling from one state to another. Individuals entering the Virgin Islands from a state pass through no such obstacles that would alert them of the fact that leaving a state and entering the Virgin Islands is materially different than traveling between the states.

In sum, the Court finds that the government's interest in conducting the type of search at issue here is less compelling than the government's interest in conducting the searches at issue in *Hyde*. In addition, the intrusion on privacy here is more significant than the intrusion presented in *Hyde*. Balancing these interests, the Court holds that the warrantless searches of the sealed mail packages in this matter were not reasonable.

8     Any argument that the Virgin Islands's status as a territory warrants a different conclusion is similarly unavailing. Indeed, the Third Circuit, in another context, has recognized the vigor of a Constitutional mandate implicit in legislation affecting the territory. *See JDS Realty Corp. v. Gov't of Virgin Islands*, 824 F.2d 256, 259 (3d Cir. 1987), *judgment vacated on other grounds*, 484 U.S. 999 (1988) ("That the Virgin Islands is an unincorporated territory is of no consequence in terms of the constitution's grant of affirmative power to Congress to regulate interstate commerce.... We conclude that the powers granted to Congress by the commerce clause are implicit in the territorial clause.").

9     Thus, in the context of border searches, the following syllogism should hold true.

     (a) Sealed packages originating in a State mailed to a United States destination are packages that travel and remain within the United States.

     (b) Packages that travel and remain within the United States enjoy the protection of the Fourth Amendment from warrantless searches.

     (c) Therefore, sealed packages originating in a State that are mailed to a United States destination enjoy the protection of the Fourth Amendment from warrantless searches.

The argument advanced by the government here challenges that logic. Indeed, the government's position causes the syllogism to implode.

10     *See, e.g., United States v. Wright*, 493 Fed. App'x 265, 271 (3d Cir. 2012) ("Having settled that the warrants were deficient, we turn to the issue of whether their deficiencies, when coupled with the law enforcement conduct here, require suppression of the evidence found during the search."); *United States v. Varlack Ventures*, 149 F.3d 212, 216 (3d Cir. 1998) ("[W]e have no need to decide whether Fredericks enjoyed a reasonable expectation of privacy in the public areas of his vessel since, even if he did, the Coast Guard officers fulfilled the requirements for conducting a warrantless search of his vessel."); *United States v. Williams*, 612 F.2d 735, 739 (3d Cir. 1979) ("Exigent circumstances therefore existed, and we see no reason to second-guess their tactical decision to deny the suspect the advantages that delay to procure a warrant would have presented."); *Gov't of V.I. v. Rijos*, 285 F. Supp. 126, 132 (D.V.I. 1968) ("Since the issuance of the search warrant in this case was based upon sufficient probable cause, the subsequent search will not be deemed invalid on this basis."); *People v. Fisher*, 2 V.I. 395, 399 (Police Ct. 1953) ("That no warrant shall issue but upon probable cause supported by oath or affirmation and particularly describing as the place to be searched and the persons or things to be seized.").

United States v. Baxter, Not Reported in Fed. Supp. (2018)

11    Puerto Rico is within the United States Customs Zone. See 19 U.S.C. § 1401(h) ("The term 'United States' includes all Territories and possessions of the United States except the Virgin Islands, American Samoa, Wake Island, Midway Islands, Kingman Reef, Johnston Island, and the island of Guam.").

12    The Supreme Court has recognized as much, instructing: "Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy." *Jacobsen*, 466 U.S. at 114. The packages here are no different.

13    In light of clear Supreme Court authority, it would seem to behoove law enforcement to obtain a search warrant before searching any sealed mail letter, package, or "wrapped parcel" travelling in any direction between the Virgin Islands and the mainland. Given that such "effects" are in the custody and control of law enforcement, and there is no danger of loss or destruction of the effect, it would seem constitutionally prudent, and a minor task, to obtain a search warrant.

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**::: LEXOLOGY**

**Register now** for your free, tailored, daily legal newsfeed service.

Find out more about Lexology or get in touch by visiting our **About** page.

Register

# Res judicata and occurrence of new facts

**Kalliopé**

**France** | October 25 2016

**Introduction**

On June 21 2016 the commercial branch of the Supreme Court renewed its application of the *res judicata* principle when the situation acknowledged by the first-instance judge was modified by subsequent events.(1)

A litigant whose case has already been tried is normally unable to sue the same party on the same subject again. However, the court provides an exception if the litigant can prove that new events occurred or were revealed following the first judgment.

**Facts**

The dispute in this case related to the purchase of a shop. The purchaser blamed the seller, who failed to inform his co-contractor of the imminent opening of another shop doing the same business nearby.

As per the first action, the appeal court recognised deliberate negligence from the seller. Nevertheless, the court refused to indemnify the purchaser in light of the fact that the competitor was not yet set up and thus any damage was not actual and not certain.

The claimant did not appeal the decision before the Supreme Court, but decided to file a second action based on the same grounds after the second shop was installed.

The Bordeaux Appeal Court granted damages.

The seller appealed to the Supreme Court. The court had to rule on the authority of *res judicata* attached to the first judgment, delivered when the damage was uncertain.

**Decision**

The Supreme Court confirmed the Bordeaux Appeal Court decision despite opposition from the seller, who argued that the *res judicata* principle barred the admissibility of the purchaser's action grounded between the same parties on the same object and cause.

The court noted that the store's opening followed the first decision and modified the situation as recognised by the first judges. Therefore, it excluded the application of the *res judicata* principle.

**Comment**

The authority of *res judicata* in French law is provided by Article 1351 of the Civil Code, according to which:

> "*The authority of* res judicata *applies only to what was the object of a judgment. It is necessary that the thing claimed be the same; that the claim be based on the same cause; that the claim be between the same parties and brought by them and against them acting in the same qualities.*"

RECEIVED & FILED

JAN 21  A 11: 20

U.S. COURT OF
INTERNATIONAL TRADE
OFFICE OF THE CLERK